**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEPHEN GROSS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | 2:02-cv-1317 |
| ) | |
| TONOMO MARINE, INC., ) | |
| ) | |
| Defendant. ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF COURT**

On July 29, 2002 Plaintiff Stephen Gross ("Plaintiff") filed a Complaint in Admiralty against defendant Tonomo Marine, Inc. ("Defendant"). Plaintiff alleges that Defendant negligently operated a barge-mounted crane on the Monongahela River. Specifically, Plaintiff alleges that he was struck in the head and back by some part of Defendant's crane while helping to unload steel billets from a river barge onto a flat bed tractor-trailer truck.

The case was originally assigned to the Honorable William L. Standish, and was re-assigned to this member of the Court on October 7, 2002. The case was then referred to United States Magistrate Judge Amy Reynolds Hay, who granted Plaintiff leave to file a First Amended Complaint in Admiralty. The case was later assigned to Magistrate Judge Lisa Pupo Lenihan, who recommended that the Court grant summary judgment in favor of Plaintiff on the issue of whether Defendant's barge-mounted crane was a "vessel" for purposes of subject matter jurisdiction. Document No. 43. No objections to the Magistrate Judge's Report and Recommendation ("R&R") were filed, and the Court adopted the R&R as its opinion. Document No. 44. The case was then referred back to the undersigned for trial. A non-jury trial commenced on January 9, 2006 and concluded the next day. The record was kept open for thirty days at the request of counsel for additional evidentiary filings. The Court also afforded the parties an opportunity to submit post-trial proposed findings of fact and conclusions of law. Plaintiff has submitted PLAINTIFF'S REVISED FINDINGS OF FACT AND CONCLUSIONS OF LAW (*Document No. 85*), as well as the deposition testimony of two witnesses on damages (*Document Nos. 83 & 84*). Defendant has filed SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF DEFENDANT TONOMO MARINE, INC.

(*Document No. 86*), as well as its MEMORANDUM OF LAW (*Document No. 87*).[1]  The issues have been fully briefed, and the matter is ripe for disposition.  Accordingly, the Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).  For the reasons that follow, the Court finds in favor of Defendant and will enter judgment accordingly.

## Findings of Fact

1. At some time prior to June 13, 2000, Defendant entered into an agreement with Riverview Steel to unload steel billets from a barge on the Monongahela River and transport them to Riverview Steel.  Defendant hired Richard Lawson Excavating to transport the steel billets from the dock landing to Riverview Steel.

2. The dock landing was located in Glassport, Pennsylvania.  Defendant's own dock landing was not used in the unloading of the barge because of insufficient space to maneuver large trucks.  Instead, the barge was unloaded at a nearby dock landing owned by Mon Valley Transportation.

3. Before the job started, Ed McGavitt ("McGavitt"), President of Defendant, held a meeting with Richard Lawson Excavating to discuss the procedure to do the job for Riverview Steel.  It was agreed that Defendant would handle the marine side of the operation and Richard Lawson Excavating would handle the shore side of the operation, including the loading of the trucks.

4. On June 13, 2000, the date of the alleged incident, Plaintiff was employed by Richard Lawson Excavating as a heavy equipment operator.  Joint Stipulation at ¶ 1.  During a lull in the excavating business, Plaintiff was directed by his employer to report to the dock landing of Mon Valley Transportation to assist in the loading of the steel billets onto trucks.

5. Mark Miller ("Miller") was a truck driver employed by Richard Lawson Excavating.  Miller and Plaintiff worked together as a team in the loading of the billets.  Miller's

---

[1] No transcript has been filed of record.

truck was parked parallel to the wall of the dock landing while the steel billets were loaded.

      6.      The steel billets, which are akin to long steel beams, were approximately 30 feet in length and measured approximately 4 inches by 4 inches square. Six to eight billets were bundled together, and one bundle of billets was moved at a time.

      7.      The billets were unloaded from the barge by use of a crane called the "MODCO" (the "MODCO" or "the crane").[2] The MODCO was situated on a barge in the Monongahela River.[3] At all relevant times the MODCO was operated exclusively by Richard Shimko ("Shimko"), who was employed by Defendant.[4] Shimko was an experienced crane operator and had operated the MODCO since 1996.

      8.      The process of unloading the barge was carried out as follows: Defendant's employees on the barge would place a cradle and sling made from chain around the billets. The chains were fastened to each end of the billets and were connected to a spreader beam. The spreader beam was 20 feet in length and weighed two to two and one-half tons (4,000-5000 lbs.). Directly above and attached to the spreader beam was a shiv block. The shiv block was essentially a multi-cable pulley and weighed approximately 1,000 pounds. Multiple lengths of cable (approximately seven) connected the shiv block to the boom of the crane.

      9.      Once the two chains were attached to the billets and all of the slack was taken out of the chains, the billets would hang approximately ten (10) feet below the spreader beam.

      10.      After the billets were chained to the spreader bar, the crane would lift them from the barge and swing into position over the trailer. In order to avoid confusion, only Miller would

---

[2] McGavitt testified that the MODCO was built in 1958 and was powered by a steam engine. The MODCO was somewhat outdated due to its steam engine, but, as explained below, there is no evidence that the MODCO was defective or otherwise not operating properly.

[3] A towboat was used to move the MODCO from Defendant's dock landing to Mon Valley Transportation's dock landing. Once located at Mon Valley Transportation's dock landing, the MODCO was spudded down and secured with two or more lines. There is no credible evidence that the MODCO was improperly secured or unstable.

[4] The Court does not credit Miller's testimony to the contrary that there was a change in operators during the loading process.

convey hand signals to Shimko. Miller's testimony reflected that he was well-versed in the use of hand signals. Additionally, Shimko verified that Miller and other truck drivers knew the hand signals that would be used.

11. When the billets were positioned above the trailer, Plaintiff and Miller would manually guide them into proper position to be lowered onto the trailer. Miller would then use hand signals to direct Shimko to lower the load onto the trailer. After the load came to rest on the trailer, Miller and Plaintiff would detach the two chains which the crane would lift away and the process would be repeated.

12. Miller worked at the tractor end of the trailer and Plaintiff worked at the back end of the trailer. Miller and Plaintiff had to use their hands to physically guide the billets into position so that they could be lowered into position on the trailer deck. Their practice was to wait until the billets were approximately two feet above the deck of the trailer before they climbed onto the trailer to guide the billets into position.

13. The workers employed by Defendant did not instruct or supervise Miller or Plaintiff in the manner in which the steel billets were loaded onto the trailer.

14. There is no credible evidence that the MODCO malfunctioned on the day of the alleged incident or was otherwise defective. The MODCO had to be inspected and certified every year, which included an inspection of all of its moving parts. The MODCO had been properly inspected and certified as of June 13, 2000.

15. There was conflicting testimony at trial about whether an accident involving Plaintiff occurred on June 13, 2000. Those witnesses who testified that an accident did in fact occur gave inconsistent testimony about how the alleged accident occurred.

16. Plaintiff testified that there was an accident on June 13, 2000. Plaintiff testified that he and Miller had loaded about three or four bundles of billets prior to the accident. According to Plaintiff, a bundle of billets started to slip off of the side of the trailer while he and Miller attempted to maneuver it into position. Miller allegedly signaled the crane operator to lift the billets back up so that they could be repositioned. When the billets were approximately at knee height, they allegedly dropped suddenly and hit the deck of the trailer. Plaintiff testified

that the spreader beam hit him on the head and shoulders, and as a result he was pinned down on the deck of the trailer by the spreader beam. Plaintiff further testified that he lost consciousness for eight (8) to ten (10) minutes, and that Miller, Fritz Lawson and some of Defendant's employees moved the spreader beam off of his body.

17. As explained below, the Court does not credit Plaintiff's version of what occurred at the job site. However, it is undisputed that Plaintiff went to the Emergency Room of Jefferson Hospital on June 13, 2000, where he complained of a laceration of the left wrist and soreness in his lower back with radiation down his left leg. Defendant's Exhibit F (typed narrative of examination). Plaintiff was interviewed by the triage nurse at Jefferson Hospital at 1609 hours, or 4:09 p.m. *Id*. Contrary to the testimony of McGavitt, Plaintiff testified that he was transported to Jefferson Hospital by McGavitt. The Court does not credit Plaintiff's testimony as to how he was transported to the hospital.

18. The physical examination performed by Dr. Stevenson at Jefferson Hospital Emergency Room was essentially normal except for the presence of a 3.5 cm laceration of the left wrist. The laceration was sutured. *Id*. Plaintiff was also diagnosed with mild acute lumbosacral strain and mild closed head injury. *Id*.

19. Plaintiff returned to his job with Richard Lawson Excavating on June 14, 2000, and did not miss any work because of the alleged back injury. Additionally, Plaintiff never made any complaints of back injury or pain to his employer for several weeks or longer after June, 2000.

20. Miller also testified that there was an accident which involved Plaintiff. Specifically, Miller testified that while he and Plaintiff were on the deck of the trailer he heard a thump and turned to see Plaintiff laying across billets that had already been loaded on the trailer. Miller testified that he did not see anything happen because he was looking away at that exact moment, but he thought that Plaintiff may have been struck on the head by either the billets or the spreader beam.[5]

---

[5] Miller and Plaintiff testified that Plaintiff was wearing a hard hat at the time.

21.     Miller also testified that when he walked over and asked Plaintiff if he was all right, Plaintiff replied, "I'm not sure." According to Miller, the spreader beam was not in the way. Miller further testified that Plaintiff was awake, not visibly bleeding and did not appear to have any broken bones. According to Miller, after the accident the crane operator got out of the crane and the loading of the truck stopped for approximately half an hour. Unlike Plaintiff, Miller did not testify that the billets suddenly dropped to the deck of the trailer, he did not testify that Plaintiff was pinned down on the deck of the trailer by the spreader beam, and he did not testify that Plaintiff lost consciousness at all.[6]

22.     In light of the various inconsistencies, implausibilities and contradictions with other evidence which the Court finds to be credible, the Court does not credit Plaintiff's testimony about the accident, and likewise the Court does not credit Miller's testimony about the accident. Both men testified that they were on the trailer attempting to position the billets when the alleged accident occurred. Had an accident occurred in the manner described by either Plaintiff or Miller, their respective testimony could not be punctuated with the manifest inconsistencies described above.

23.     As further evidence of Plaintiff's lack of credibility, the spreader beam weighed two to two and one-half tons. Had it hit Plaintiff on his head and back and pinned him to the deck of the trailer, a handful of men probably would not have been able to lift it, and Plaintiff's injuries likely would have been far more severe than a cut on his wrist, a mild acute lumbosacral strain and mild closed head injury. It is also worth mentioning that Plaintiff and Miller were each working at the ends of the 30 foot billets, and the spreader beam was 20 feet in length. This indicates that had the spreader beam dropped straight down, there would have been at least 5 feet between the position where Plaintiff would have been working and where the spreader beam would have fallen. Both Miller and Shimko testified credibly that the spreader beam was in the middle of the truck, and was not over the heads of the two workers when billets were being

---

[6] Additionally, Miller testified that sometime after the accident occurred he heard somebody, either the crane operator or a barge worker, say that a pin had come out of the crane's brake and caused the brake to slip. The Court does not credit this testimony.

lowered onto the truck.

24.     The testimony of Shimko, which the Court credits in its entirety, was not consistent with the stories told by Plaintiff and Miller. Shimko testified that when he was operating the crane, the truck with the workers was no more than 30 to 40 feet away from the crane. Shimko could always see the spreader beam from the cab of the crane, and he did not strike anyone with it on June 13, 2000. Similarly, Shimko testified that the spreader beam never fell to the deck of the truck. His view of each load of billets and the area where Plaintiff and Miller were working on the truck was continuously unimpaired.

25.     Shimko also testified that no unusual incident occurred on June 13, 2000 at the work site. No work stoppage occurred on June 13, 2000 to assist Plaintiff or anyone else, to move a spreader beam off of a truck driver or worker, or to take an injured truck driver or worker to the hospital.

26.     Finally, Shimko testified that on June 13, 2000 the crane did not malfunction, and that he did not err in his operation of the crane. Specifically, the crane's brakes did not slip or malfunction, nor was there any other mechanical failure by the crane. Shimko also testified credibly that his foot did not slip off the brakes, and that the crane's swing brake was locked in at all times when Plaintiff and Miller were on the deck of the trailer. When the crane's swing brake was locked the spreader beam could not move toward either the cab of the truck or the back end of the trailer.

27.     The testimony of McGavitt, which the Court also credits in its entirety, was likewise not consistent with the stories told by Plaintiff and Miller. First, McGavitt testified that no unusual incident occurred on June 13, 2000 at the work site. Contrary to Plaintiff's testimony, McGavitt testified that he did not transport Plaintiff to the Jefferson Hospital Emergency Room on June 13, 2000. As mentioned above, it is undisputed that Plaintiff was interviewed by the triage nurse at Jefferson Hospital at 4:09 p.m. Defendant's Exhibit F. Although the hospital is at least 20-30 minutes from the landing site, McGavitt testified that he arrived at the Mon Valley Transportation landing late in the afternoon on June 13, 2000 at around 4:00 p.m.

28.	McGavitt testified that after he arrived at the job site one of his employees mentioned that someone had fallen that day (which may have been Plaintiff), and that the person who fell was not an employee of Defendant. The employee's report of the incident was very vague, and no one stated that Defendant's crane was in any way involved in the incident. McGavitt testified that he "fluffed it off."

29.	Plaintiff never reported any accident whatsoever with the truck, the billets, the crane or the spreader bar to anyone employed by Defendant on June 13, 2000 or at anytime thereafter.

30.	Plaintiff has severe spinal stenosis, which was not caused by any alleged injury which occurred on June 13, 2000.

31.	Plaintiff may have been involved in some sort of accident on June 13, 2000 which caused the laceration on his left wrist, mild acute lumbosacral strain and mild closed head injury for which he received treatment at Jefferson Hospital. The Court does not believe that the accident occurred in the manner described by either Plaintiff or Miller. Plaintiff may have accidentally bumped his head on the billets at some point during the operation, he may have fallen on top of the billets due to his own carelessness, or he may have otherwise been involved in some minor accident on the job. The minor accident may have caused the injuries for which Plaintiff sought medical attention. However, there is no credible evidence that any accident in which Plaintiff was involved on June 13, 2000 was related to or caused by an act or omission of Defendant.

**Conclusions of Law**

1.      This Court has admiralty jurisdiction over this action pursuant to 28 U.S.C. § 1333[7] and the "Admiralty Extension Act," 46 App. U.S.C. § 740[8], because it arises from acts and/or omissions involving a "vessel," *i.e.*, the MODCO, which allegedly caused injury to a person working on land.  Federal Rules of Civil Procedure Rule 9(h) and 38(e) provide that all issues in this admiralty action shall be tried to the bench.

2.      The applicable law in this action is general maritime law.  "It is settled that the general maritime law imposes duties to avoid unseaworthiness and negligence ..." *Norfolk Shipbuilding & Drydock Corp. v. Garris*, 532 U.S. 811, 813 (2001).

3.      The elements of a cause of action for negligence under general maritime law are as follows: 1) a duty of care which obliges the person to conform to a certain standard of conduct; 2) a breach of that duty; 3) a reasonably close causal connection between the offending conduct and the resulting injury; and 4) actual loss, injury, or damages suffered by the Plaintiff. *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003); *see also Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840 (5th Cir. 2005) ("The elements of a maritime negligence cause of action are essentially the same as land-based negligence under the common law.") (*citing Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)).

4.      Plaintiff's First Amended Complaint in Admiralty alleges that Defendant was negligent in the following manner:

        a.      In operating the crane without exercising the degree of care and caution that a reasonable person would have exercised;

---

[7] Title 28, United States Code, section 1333 provides that "[t]he district court shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled."

[8] The Admiralty Extension Act provides, in relevant part, that "[t]he admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury ... caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."  46 App. U.S.C. § 740.

    b.    In being inattentive to the conditions there and then existing;
    c.    In failing to have the crane under proper control;
    d.    In failing to exercise that degree of care and caution required under the circumstances of the work environment;
    e.    In failing to keep a proper lookout;
    f.    In failing to warn Plaintiff of the dangerous and hazardous conditions then and there existing;
    g.    In failing to take reasonable steps to ascertain and ensure Plaintiff's safety prior to operating the crane;
    h.    In being inattentive to the location of Plaintiff;
    i.    In failing to follow and adhere to the customary practices and procedures for the operation of cranes that were in existence at that time and place;
    j.    In operating Defendant's crane in violation of OSHA regulations as well as those occupational regulations put into place by the Commonwealth of Pennsylvania;
    k.    In failing to inspect the crane and its related components prior to its operation;
    l.    In failing to repair and/or maintain the crane and its related components;
    m.    In failing to properly secure the spreader beam;
    n.    In failing to properly secure the load of ingots' (*sic*);
    o.    In operating the crane when it was not in the proper condition to do so;
    p.    In operating a crane that was not in proper mechanical or working condition;
    q.    In failing to properly supervise its crane operator;
    r.    In failing to use a competent and/or qualified crane operator;
    s.    In failing to properly and adequately train its crane operator;
    t.    In failing to properly and adequately instruct its crane operator; and
    u.    In utilizing a crane operator who as (sic) not fit to perform the task at hand when it knew or should have known through the exercise of reasonable diligence that its crane operator was unfit.

First Amended Complaint in Admiralty at ¶ 11.

    5.    Defendant undoubtedly had a duty "to observe the degree of care, precaution, and vigilance which the circumstances demand." *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d at 544 (citation omitted). The Court finds and rules that the credible evidence presented at trial does not support any of Plaintiff's theories of negligence. Plaintiff has failed to establish any

negligent conduct by Defendant or any of its employees. Although the Court is sympathetic to Plaintiff's condition, there is simply no credible evidence in this case that Defendant breached any duty which it owed to Plaintiff at any time during the unloading and loading of the steel billets on June 13, 2000.

## **Conclusion**

For the foregoing reasons, judgment will be entered in favor of Defendant on Plaintiff's claim of negligence. An appropriate Order follows.

McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEPHEN GROSS, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | 2:02-cv-1317 |
| ) | |
| TONOMO MARINE, INC., ) | |
| ) | |
| Defendant. ) | |

**ORDER OF COURT**

AND NOW, this 9th day of March, 2006, in accordance with the foregoing Findings of Fact and Conclusions of Law it is hereby **ORDERED, ADJUDGED and DECREED** that the Court finds in favor of defendant Tonomo Marine, Inc. on Plaintiff Stephen Gross's claim of negligence.  The Court will enter a separate judgment accordingly, and the Clerk shall docket this case closed.

BY THE COURT:

s/ Terrence F. McVerry
United States District Court Judge

cc:    Christopher D. Kuebler, Esquire
Email: ckuebler@obryanlaw.net
Dennis M. O'Bryan, Esquire
Email: dob@obryanlaw.net
Howard M. Cohen, Esquire
Email: hcohen@obryanlaw.net

Leonard Fornella, Esquire
Email: fornella@hwwlaw.com
Marilyn Larrimer, Esquire
Email: mlarrimer@hwwlaw.com